IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | 4:04-cr-116 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| BRIAN MICHAEL GALL, | * | |
| | * | SENTENCING MEMORANDUM |
| Defendant. | * | |
| | * | |

## I.   INTRODUCTION

On May 27, 2005, this Court sentenced the Defendant, Brian Michael Gall to a thirty-six month term of probation.   This memorandum sets forth the methodology and reasoning for that sentence.

On March 2, 2005, the Defendant pleaded guilty to one count of conspiracy to distribute MDMA, also known as "ecstacy", a Class C felony.   *See*  21 U.S.C. §§ 846, 841(b)(1)(C).   In fashioning a sentence that is "sufficient, but not greater than necessary, [the Court must consider] the nature and circumstances of the offense and the history and characteristics of the defendant . . . ."  18 U.S.C. § 3553(a)(1).  Further, the Court must consider the need for the sentence imposed, in that it should:  reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  18 U.S.C. § 3553(a)(2).   Along with these factors, the Court must determine the kinds of sentences available, including those advised by the Sentencing Commission.  18 U.S.C. §§ 3553(a)(3)-(5); *see United States v. Yahnke*, 395 F.3d 823, 824 (8th Cir. 2005) (requiring that a

sentencing court "must consult Guidelines and take them into account when sentencing"); *United States v. Mathijseen*, 406 F.3d 496, 498 (8th Cir. 2005) (reviewing a district court's interpretations of the Guidelines *de novo*, factual findings for clear error, and the final sentencing determination for reasonableness).   The Court must also "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" and assess the need to provide restitution to victims.  18 U.S.C. §§ 3553(a)(6), (7).   Finally, because a term of imprisonment is available in this case, the Court must heed the statutory admonition "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

## II.   DISCUSSION
### A.   Advisory Guidelines Range

The Presentence Report calculation, which the Court adopts, subjects the Defendant to a total offense level of 24 based on the quantity of 10,000 MDMA tablets stipulated to by the parties.  This amount converts to 87.5 kilograms of marijuana.   The Defendant, however, received a two-point reduction under U.S.S.G. § 5C1.2 for being "safety valve" eligible.  The Defendant also received a three-point adjustment for acceptance of responsibility.   Taking these reductions into account, the final offense level calculation is 19.

The Defendant's criminal history is minimal, falling into criminal history category one ("I").   The Defendant's single criminal history point arises from conduct when, at the age of eighteen, the Defendant paid a fine for failure to zip a gun bag, which lay inside a motor vehicle while on a hunting trip. The Defendant pled guilty to two other infractions, as will be discussed below, but the associated conduct did not earn the Defendant any criminal history points under the Guidelines.   Accordingly, the

advisory Guidelines sentencing range for this Defendant is between 30 and 37 months.

B.   Departure Motions

The Defendant made several motions for downward departures from the Guidelines calculation above based on the Defendant's age, cooperation with the government,[1] remorse, and post-offense rehabilitation.  Because these factors are more aptly considered under the statutory factors listed in 18 U.S.C. § 3553(a), they are denied.   The Defendant also moves for a downward departure based on acceptance of responsibility.  Since he has already received a three-point reduction for acceptance, that motion is also denied.   *See* U.S.S.G. § 5K2.0(d) (prohibiting such a departure because it is already taken into account under § 3E1.1).   Finally, the Defendant moves for downward departures based on the arguments that the Defendant's offense conduct was aberrant and that the Defendant voluntarily withdrew from the conspiracy well before the Indictment was filed in this case.

The Court cannot conclude the Defendant's offense conduct was aberrant behavior and, therefore, declines to downwardly depart on that basis.  Under the policy statement, a court may depart downward "if the defendant committed a single criminal occurrence or single criminal transaction that:  1) was committed without significant planning; 2) was of limited duration; and 3) represents a marked deviation by the defendant from an otherwise law-abiding life."  U.S.S.G. § 5K2.20.   The facts, as stipulated by the parties, show that Defendant's offense conduct involved a conspiracy that

---

[1]  The Government filed no substantial assistance motion in this case.   The Government conceded that, while the Defendant was receptive to providing testimony at the trials of co-defendants and other information, since his offense conduct occurred almost four years before the Indictment was filed, whatever information the Defendant could reveal was of little use.  Ironically, by the time the Defendant provided information, the individuals he knew about had already confessed or were cooperating themselves.

lasted for at least seven months and included numerous criminal transactions.  Conspiracy, by its very nature, almost completely forecloses a finding of aberrant behavior as a basis for downward departure because it invariably involves a degree of planning and is not, except in rare cases, an act of limited duration.

Neither can the Court find the Defendant's voluntary termination from the conduct prior to law enforcement intervention constitutes a basis for departing downward.   The Defendant relies on *United States v. Nunemacher*, 362 F.3d 682, 689 (10th Cir. 2004), which allowed a district court to consider downwardly departing for a defendant's voluntary termination of criminal conduct before such conduct was brought to the attention of law enforcement.   The Tenth Circuit reasoned that voluntary termination reflected that the criminal conduct was atypical and, therefore, worthy of consideration for a departure, if exceptional.   *See id.* at 688 ("[V]oluntary termination of illegal activity and cooperation with law enforcement are already taken into account by an acceptance of responsibility adjustment . . . thus may not serve as a basis for departure unless [they] are present to an exceptional degree.") (citing *United States v. Benally*, 215 F.3d 1068, 1075 (10th Cir. 2000)).   Voluntary termination likewise comes under consideration in the Eighth Circuit when a defendant's acceptance of responsibility is an issue. *United States v. Card*, 390 F.3d 592, 594 n.3 (8th Cir. 2004) (relying on a district court's application of U.S.S.G. 3E1.1 n.1(b) to determine whether a defendant accepted responsibility for his conduct).   Here, the Defendant has already received a three-point reduction in his offense level for acceptance and his voluntary termination, after seven months and numerous criminal transactions, cannot be said to be so exceptional as to make his criminal conduct atypical.   The Defendant's withdrawal from the conspiracy is better discussed within the confines of 18 U.S.C. § 3553(a).

-4-

### C.   Imposition of Sentence

1.       *The Nature and Circumstances of the Offense*

The Defendant is charged with entering and exiting a conspiracy that involved the distribution of MDMA.  The overall conspiracy occurred from May, 1996 to on or about October 30, 2002.  The Defendant's involvement began with the purchase, for the purpose of distribution, of MDMA in February, 2000.  The Defendant's involvement ended in September, 2000.  In September, 2000, the Defendant informed a coconspirator that he was getting out of the drug business and wanted nothing more to do with the conspiracy.  No other aggravating factors are present.  None of the offense conduct involved violence, nor were firearms present.  The offense level is derived solely on the basis of drug amounts.   The Defendant believed that, up until the Indictment was filed in April, 2004, his criminal conduct was all part of the past.

2.       *The Character of the Defendant*

The Defendant's criminal-history conduct has been alluded to and appears to stem from his addictions to drugs and alcohol.  Other than the firearm offense discussed above, the Defendant pleaded guilty, at the age of eighteen, to failure to maintain control of his vehicle and was ticketed for underage drinking of alcohol.  In March, 2000, contemporaneous with the time of the offense conduct in the present case, the Defendant pleaded guilty to possession of marijuana, for which he received a one year deferred judgment.   In fact, all of the Defendant's criminal conduct, including the present offense, occurred when he was twenty-one-years old or younger.[2]

---

[2]   Immaturity at the time of the offense conduct is not an inconsequential consideration.  Recent studies on the development of the human brain conclude that human brain development may not

To the Defendant's credit, he voluntarily and explicitly withdrew from the

conspiracy in September, 2000.[3]   In addition, the Defendant's post-offense behavior has been

exemplary.   The Defendant continues to wage a successful battle against drug and alcohol addictions;

he has remained sober while on bond under pre-trial and pre-sentence release.   After turning his back

on the conspiracy, the Defendant earned his bachelor of science degree in computer science from the

University of Iowa.   The Defendant started, and continues to own and operate BMG Construction

---

become complete until the age of twenty-five.   *See* Elizabeth Williamson, *Brain Immaturity Could Explain Teen Crash Rate*, Wash. Post, Feb. 1, 2005 at A01 (summarizing a recent National Institutes of Health ("NIH") study that suggests "that the region of the brain that inhibits risky behavior is not fully formed until age 25").   This is of critical importance in the area of criminal law.   The Sentencing Commission, in its studies, has deduced that recidivism rates drop as the age of defendants increase. *See United States v. Nellum*, No. 2:04-cr-30-ps, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005 ).   The Supreme Court based its most recent death penalty decision, *Roper v. Simmons*, on studies indicating adolescents are less culpable for their actions than adults.   *See* 125 S. Ct. 1183, 1195 (2005) (stating that "as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' (citations omitted) It has been noted that 'adolescents are overrepresented statistically in virtually every category of reckless behavior.'") (quoting Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Review 339 (1992)).   While the *Roper* court held imposition of the death penalty is unconstitutional for those persons who committed the death-eligible crime before the age of eighteen, the recent NIH report confirms that there is no bold line demarcating at what age a person reaches full maturity.   While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

[3]   The Government estimates that the Defendant made between $30,000 and $40,000 during his time in the conspiracy.   Like so many facts to be considered when a court imposes a sentence, this fact can be viewed from different perspectives.   On the one hand, the Defendant should be punished for profiting from a criminal scheme.   The Government argues that this can best be met by a sentence near the bottom of the advisory Guidelines sentencing range, i.e., thirty months imprisonment.   On the other hand, the Defendant, who is from a working-class family and has few financial resources, decided to turn his back on what, for him, was a highly profitable venture.   The Presentence Report, paragraph 72, characterizes the profits as "easy money."   The Court can not consider, for the purposes of sentencing, one side of the financial aspect of the offense conduct without considering the other.

Services, which operates as a sub-contracting service for the installation of Pella-brand windows and doors.  Representatives of the Pella Corporation have  written to the Court describing the Defendant as "reliable, honest, friendly, and polite," with a "superior work ethic . . . and a valuable resource."   Soon the Defendant's company will begin a significant construction project, the replacement of windows and doors at Northwestern University in Evanston, Illinois.   The Court has also received a small flood of letters from family, friends, and work colleagues attesting to the Defendant's character.

3.      *The Need for the Sentence Imposed*

The Court can only conclude from Defendant's post-offense conduct that he has, in fact, learned from his experience with the United States criminal justice system, and has admirably moved to secure a better future for himself.   The Court, however, is bound to impose a sentence that reflects the seriousness of joining a conspiracy to distribute MDMA.   This is best accomplished, in this case, by a term of Probation for three years with appropriate conditions. *See* 18 U.S.C. § 3561(a) (allowing for probation for offenses other than Class A or Class B felonies).   The Court reminds the Defendant that "probation is not an act of leniency.  Probation is a substantial restriction of freedom, it is not forgiveness, and it is not an endorsement of the offense." *State v. Peckenschneider*, 236 N.W.2d 344, 353 (Iowa 1975) (McCormick, J., dissenting).   The Defendant will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing.  He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court.  Of course, the Defendant always faces the harsh consequences that await if

he violates the conditions of his probationary term.[4]

Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life.   The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society.   In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life.   Indeed, a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.

---

[4]   Along with the mandatory conditions of probation, the Court also provides the following conditions under 18 U.S.C. § 3563(b), which are in keeping with the factors set forth in §§ 3553(a)(1) and (a)(2):   1) You shall participate in a program of testing and treatment for substance abuse, as directed by the Probation Officer, until such time as you are released from the program by the Probation Office;  2)  You shall not use alcohol and/or other intoxicants during and after the course of treatment;  3) You shall submit to a mental health evaluation and participate in treatment, if recommended, which may include compliance with any medical regime recommended by treatment personnel, as directed by the Probation Officer; 4) You shall not patronize business establishments where more than fifty percent of the revenue is derived from the sale of alcoholic beverages; and 5) You shall work only at employment approved by the U. S. Probation Office.  You shall consult the U. S. Probation Office prior to any changes in employment.  You shall not terminate any employment without prior approval from the U. S. Probation Office.

III.   CONCLUSION

The introductory commentary to Part B - Probation of the Sentencing Guidelines states that: "Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet the fully statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."   The Court recognizes that, according to the Sentencing Guidelines, Probation is not recommended when, as in this case, the Guidelines range falls outside of Zone A.[5]   Nevertheless, the Court finds that the circumstances of the offense and the

---

[5]  This is because the offense level in this case, based solely on drug quantity, subjects the Defendant to a final offense level of 19.  Other courts have recognized, however, that for a variety of reasons, the Guidelines calculations based on drug amount may overrepresent the actual offense conduct.  *See United States v. Smith*, 359 F. Supp. 2d 771, 776 (E.D. Wis. 2005) (noting that defendant's offense level would have been reduced by six levels if he was responsible for powder instead of crack cocaine); *United States v. Nellum*,  No. 2:04-cr-30-ps, 2005 WL 300073 at *5 (N.D. Ind. Feb. 3, 2005 ) (describing the system of drug quantities as random as it is played out in reality); *United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019, 1026 n.6 (D. Neb. 2005) (stating that "the quantity system was developed to punish bigger distributors more harshly, but practice of charging conspiracies over a long period of time has the result of aggregating many small distributions so as to make a long-term small quantity distributor look like a large-quantity distributor").  While not denigrating the seriousness of the crime in the present case, the Court finds the offense level, based solely on drug quantity, does not adequately reflect the offense conduct.

The Government argues that, because the offense level in this case is derived from the 1999 Guidelines and not a subsequent Guidelines, the Defendant already receives a benefit.  Because, had the conduct occurred later, the Defendant would be subject to a higher sentencing range.  This reasoning stems from harsher Guidelines sentencing ranges in drug trafficking cases based on drug amounts.  This is no argument.  The "benefit" of the 1999 calculation incurred by the Defendant was the result of his own decision to withdraw from the conspiracy.   The Sentencing Commission did not raise the offense level associated with the same drug quantity in order to benefit those who had already committed the crime or to somehow reward them for engaging in earlier criminal conduct, but to reflect Congressional intent to toughen sentences for those involved in drug trafficking.

character of the Defendant, for the reasons set forth above, warrant a sentence of Probation as being

sufficient, but not greater than necessary, to comply with the statutory mandates of 18 U.S.C. §

3553(a).

       Dated this ___2nd___ day of June, 2005.


_____
ROBERT W. PRATT
U.S. DISTRICT JUDGE