(1940380)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

05 JUN -8 PM 1:55

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IA

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                       :
     Plaintiff,      :
                       :
vs.                 :   Criminal No. 4:04-CR-116
                       :
BRIAN MICHAEL GALL,    :   <u>SENTENCING TRANSCRIPT</u>
                       :
     Defendant.     :
- - - - - - - - - - - - - -X

**ORIGINAL**

Courtroom, Second Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Friday, May 27, 2005
1:35 p.m.

BEFORE:  THE HONORABLE ROBERT W. PRATT, Judge.

APPEARANCES:

For the Plaintiff:    JASON GRIESS, ESQ.
                         Assistant U.S. Attorney
                         U.S. Courthouse Annex
                         110 East Court Avenue, Suite 286
                         Des Moines, Iowa  50309-2053

For the Defendant:    MARC MILAVITZ, ESQ.
                         Marc Milavitz Law Office
                         1733 Canyon Boulevard
                         Boulder, Colorado  80302

KELLI M. MULCAHY - CERTIFIED SHORTHAND REPORTER

204

2

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

For the Defendant:

Tom Gall                    10

Vicki Gall                  12

3

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              Good afternoon.

4              Mr. Gall, have you had the opportunity to read the

5    report in this case?

6              THE DEFENDANT:  Yes, I have, sir.

7              THE COURT:  And did you have enough time to talk to

8    your lawyer about the report?

9              THE DEFENDANT:  Yes.

10             THE COURT:  You can remain seated.

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  Mr. Milavitz, did you have the

13   opportunity to read the report in this case and talk to the

14   defendant about the issues before me here?

15             MR. MILAVITZ:  I did, Your Honor, yes.

16             THE COURT:  All right.  Mr. Milavitz, you wrote--  I

17   wanted to make sure I had the facts down here.  I have your

18   objection letter, which came on the 19th of May.  I notice that

19   paragraph 59, you say--I'm referring to your letter of May

20   19th, you say, paragraph 59, "Mr. Gall lived in Mesa, Arizona,

21   for approximately one year, not three months."  That has not

22   been changed.  How long did he live there?

23             MR. MILAVITZ:  He did live there for one year, Your

24   Honor.

25             THE COURT:  Okay.  And then--

1          MR. MILAVITZ:  I'm sorry to interrupt.  It's one year

2   and three months.

3          THE COURT:  One year and three months?

4          MR. MILAVITZ:  Yes.

5          THE COURT:  Okay.  And then on the paragraph 84, you

6   say, under "Home Mortgages," that, "This is a vacation home in

7   the Lake of the Ozarks which Mr. Gall owns along with five

8   others."  You say he contributed a relatively small amount of

9   money.  What's his equity in the place?

10          MR. MILAVITZ:  I do believe it's about $2,500, Your

11   Honor.

12          THE COURT:  And then lastly, you say, paragraph 85,

13   personal liabilities, "You omitted a personal loan Mr. Gall

14   owes his parents."  Is that 25,000 for legal expenses?

15          MR. MILAVITZ:  Yes, Your Honor.

16          THE COURT:  Okay.  I didn't see anything in

17   Ms. Dassinger's summary about his assets and liabilities.  Is

18   he paying that back?

19          MR. MILAVITZ:  The $25,000?

20          THE COURT:  Yes.

21          MR. MILAVITZ:  Your Honor, he has not started to do

22   that.  That was something that was between he and his parents

23   that he was going to determine--  I mean, I guess if he goes to

24   prison, it would be very difficult for him to start paying that

25   back.

1          THE COURT:  Right.  Is he going to pay it back?

2          MR. MILAVITZ:  Yes.

3          THE COURT:  Okay.  Thank you very much.

4          Mr. Griess, have you read the report in this case?

5          MR. GRIESS:  I have, Your Honor.

6          THE COURT:  All right.  Mr. Griess, from the

7    Government's standpoint, can you tell me, are there any factual

8    issues I have to resolve?

9          MR. GRIESS:  I don't believe so.

10          THE COURT:  All right.  Mr. Milavitz, do you know,

11    from the defendant's standpoint, are there any factual issues I

12    have to resolve?

13          MR. MILAVITZ:  From my read, Your Honor, of what I

14    wrote to the probation department and the changes I think were

15    okay, except for the same issue of this alias--  Again, I asked

16    Mr. Gall about this alias, and he had no idea why the Iowa

17    Department of, I guess, Public Safety, or whoever the law

18    enforcement people, have this down on his records as having an

19    alias.  He's never gone by any other name.

20          THE COURT:  All right.

21          MR. MILAVITZ:  So we're thinking that that's maybe a

22    mistake on their part.

23          THE COURT:  All right.  Mr. Milavitz, I read--talking

24    about the age of the defendant here, I read of his substance

25    abuse treatment, which--treatment problem, which apparently has

6

1   gone on for a long time, and I didn't see any reference to the

2   treatment that he had, I believe the record reflects, in March

3   of 1995 while he was in high school.  I asked Ms. Dassinger

4   about that.  She had no records involving that.  Does he have a

5   juvenile record?

6           MR. MILAVITZ:  Your Honor, not that he is aware of,

7   no.

8           THE COURT:  Okay.  Why did he get ordered to

9   treatment at age 16?

10          MR. MILAVITZ:  Your Honor, when Mr. Gall was 16, he

11  was involved in an automobile accident, and under the zero

12  tolerance law, I believe, of the state of Iowa, he had some

13  alcohol in his system, and, as part of that, he was ordered to

14  undergo treatment.

15          THE COURT:  By?

16          MR. MILAVITZ:  By the courts, I guess.  I don't think

17  that it resulted in him having a record.  I believe he just had

18  to undergo that treatment.

19          THE COURT:  Okay.  Mr. Gall, I have a hard time

20  concluding.  When did you meet Mr. Rinderknecht?

21          THE DEFENDANT:  In February of 2000 or--

22          THE COURT:  Okay.  The report tells me he came to

23  your apartment in '98 and '99 and on six occasions brought

24  cocaine, which he shared.  When did you meet Mr. Rinderknecht?

25          THE DEFENDANT:  I met him in February--within a month

1   or two of February of 2000.  I--  He was dealing with other

2   people in my apartment, but there was a lot of people going in

3   and out, and--

4           THE COURT:  Well, is the report wrong?

5           THE DEFENDANT:  Was he in my house?  He could have

6   been.

7           THE COURT:  No, no, no.  Did people in your house

8   share cocaine with Mr. Rinderknecht on six occasions in '98 and

9   '99?

10          THE DEFENDANT:  Not that I know of.

11          THE COURT:  Ms. Dassinger, is that from discovery?

12          PROBATION OFFICER DASSINGER:  That's from discovery,

13  sir.

14          THE COURT:  Mr. Griess, do you know anything about

15  this defendant's involvement in '98, '99 that's contained in

16  the report?

17          MR. GRIESS:  Your Honor, without looking specifically

18  at what Mr. Rinderknecht said, I do recall Mr. Rinderknecht

19  discussing the fact that he had general knowledge of the group

20  of individuals that lived at a house that I believe Mr. Gall

21  was also residing at, and that, in addition to small quantities

22  of Ecstasy and user quantities of cocaine--or I guess those two

23  drugs he would sometimes deliver to that residence for that use

24  and for the group's use.

25          THE COURT:  Okay.  Now, Mr. Griess, you can tell me,

1   because you've got extensive knowledge of the case, more than I

2   do, even though I heard the testimony during Mr. Cortez Sr. and

3   Mr. Crawford's trial.

4          I asked Ms. Dassinger this.  When one sells Ecstasy,

5   do you sell it in quantities--  The report doesn't tell me

6   this, and that's why I think I need to know this.  Do you sell

7   it in quantities of two or three, if you are a seller to a

8   consumer?  Do you sell it in five or ten, or how many Ecstasy

9   pills, if you're a dealer, do you sell to a user?

10          MR. GRIESS:  If you're selling to a user, Your Honor,

11   I mean, the answer is it could vary, the ranges, if you're

12   selling to a user.

13          For instance, in this case, there was discussion in

14   the facts that sometimes the individuals who were selling would

15   go to bars and they would sell pills for anything from 20 to 30

16   dollars a pill at a local bar.  In addition to that, the people

17   who were charged and convicted in federal court were selling to

18   people who were then also selling.

19          THE COURT:  Right.  But those were dealers that you

20   prosecuted when--  You know, there are a whole bunch of pills

21   in this case, and I'm trying to think in my own mind, I know

22   the marijuana equivalency is 87 kilograms, and the numbers just

23   get away from me when you talk about the numbers of pills.

24          But from a dealer to a user, what you're telling me

25   is it can be anywhere from two to three to ten?

1              MR. GRIESS:  Certainly.  Absolutely.

2              THE COURT:  All right.  Thanks very much.

3              Mr. Milavitz, do you want to put on some evidence?

4    My law clerk said that you had intended to.

5              MR. MILAVITZ:  I do, Your Honor.  Both of Mr. Gall's

6    parents, Tom Gall and Vicki Gall, would like to make statements

7    to the Court, if they could, please.

8              THE COURT:  All right.  You may proceed.

9              MR. MILAVITZ:  Thank you very much.  I'm going to

10   call Tom Gall, please.

11             Would the Court prefer me to stand at the podium or

12   back here?  It's going to be mostly a narrative statement.

13             THE COURT:  Oh, he's going to make a statement or

14   give testimony?

15             MR. MILAVITZ:  Just--  Well, make a statement, and

16   I've never done a sentencing in this court, so I don't know how

17   you wish--

18             THE COURT:  Well, I prefer the lawyer to be at the

19   podium and the witness in the chair.

20             MR. MILAVITZ:  That's fine.

21             THE COURT:  Okay.  And, Mr. Milavitz, you've never

22   had the idiosyncracies of me--Mr. Griess has had to tolerate

23   me--but I prefer you refer to the witnesses by the last time

24   when we're having fact-finding proceedings.

25             MR. MILAVITZ:  Thank you very much, Your Honor.

1           TOM GALL, DEFENDANT'S WITNESS, SWORN.

2           THE COURT:  You may proceed, counsel.

3           MR. MILAVITZ:  Thank you very much.

4                        DIRECT EXAMINATION

5    BY MR. MILAVITZ:

6    Q.  Could you please state your name.

7    A.  My name is Tom Gall.

8    Q.  Mr. Gall, where do you reside?

9    A.  I live in--at 84 Park View Drive in Eldridge, Iowa.

10   Q.  And are you related to Brian Gall?

11   A.  Yes, I am.  His father.

12   Q.  Are you related to Brian Gall?

13   A.  Yes, sir.

14   Q.  How are you related to him?

15   A.  I'm his father.

16   Q.  Did you wish to make a statement to the Court today

17   regarding the sentence that Brian Gall should receive?

18   A.  I do.

19   Q.  Could you please make that statement at this time.

20   A.  I will.

21           THE WITNESS:  Your Honor, I know that what Brian did

22   was wrong.  It was very wrong.  I've seen the change he's made

23   in his life.  What he did made me mad.  I'm ashamed of the fact

24   that what he did was very wrong, but he realizes that, I know

25   he does, and I've seen the changes he's made.

1      He's started his own business.  He's doing very, very

2  well.  He's got people that rely on him now.  He's grown to the

3  point where he's supporting a couple of employees.  He's got

4  contractors that count on him for his expertise.

5      And I know that what he's done shouldn't go

6  unpunished, but I would ask that you let him continue to work

7  at his business.  I think he's a greater asset to the community

8  than--in this--in his job and his work that he does, and

9  just--just the fact that a lot of people depend on him.

10      As family members, of course, we would be devastated.

11  He's got a young lady that's--he's very involved with and loves

12  very much.  And I'd just--I'd just hate to see him go to jail

13  at this time, Your Honor.

14      THE COURT:  Okay.

15  BY MR. MILAVITZ:

16  Q.  Mr. Gall, I want to touch on a couple of other issues, if I

17  could, please.  One is the issue of the loan that Brian Gall

18  has from you.  How are you employed, sir?

19  A.  I'm a mechanic for the Pleasant Valley Community School

20  District in Pleasant Valley, Iowa.

21  Q.  And your wife, how is she employed?

22  A.  My wife is a secretary for the Scott County Extension

23  Service, a part-time secretary.

24  Q.  And in making this loan to Mr. Brian Gall, do you expect or

25  need that loan to be repaid from him?

1  A.  I definitely need that loan to be repaid, and I expect it

2  to be repaid.

3  Q.  This was not a gift to him?

4  A.  It's not a gift.

5      MR. MILAVITZ:  I have nothing further.  Thank you,

6  Your Honor.

7      THE COURT:  Mr. Griess?

8      MR. GRIESS:  I have no questions.

9      THE COURT:  You may step down.

10                      (Witness excused.)

11      MR. MILAVITZ:  Your Honor, I would next call

12  Ms. Vicki Gall.

13      VICKI GALL, DEFENDANT'S WITNESS, SWORN.

14                  DIRECT EXAMINATION

15  BY MR. MILAVITZ:

16  Q.  Could you please state your name.

17  A.  Vicki Gall.

18  Q.  And where do you live, Ms. Gall?

19  A.  84 Park View Drive in Eldridge, Iowa.

20  Q.  And are you related to Brian Gall?

21  A.  Yes, I am.

22  Q.  And are you his mother?

23  A.  Yes.

24  Q.  Ms. Gall, you and Mr. Gall have made a loan to Brian for

25  the purposes of legal representation; is that correct?

1   A.  Yes, we have.

2   Q.  Do you expect or need that loan to be repaid?

3   A.  Yes, we do.

4   Q.  Can you please tell the Judge why.

5   A.  Well, because I don't think we should just, you know, let

6   him have free money and be able to just--I don't know, to pass

7   this off and figure--you know.  Plus, you know, it was quite a

8   bit of money, and we took it out of some savings, and we need

9   to have it back.

10          We've told him to wait until he--  In case he did go

11  to prison, he would have to--somebody would have to pay his

12  bills at the time, so we didn't push him, but as soon as this

13  is over, he will have to start paying us back.

14  Q.  Would it put you in a financial bind if that loan was not

15  repaid?

16  A.  Yes.

17  Q.  Ms. Gall, you've asked to make a statement to the Court

18  today regarding Mr. Brian Gall's sentence.  Can you please make

19  that statement at this time.

20          THE WITNESS:  Brian--Your Honor, Brian, I think, you

21  know, I believe he realizes and we know he made a stupid

22  mistake.  It was very stupid.  He's probably one of the first

23  ones to tell you that.  But I do believe that he's really

24  learned from it.

25          In the last year since we've been going through all

1  this, we've had a lot of support from family and friends, and

2  we've watched him grow.  He comes from a loving and Christian

3  family, and I think some of those values are coming back now,

4  and, you know, he's become more mature and grown up.

5         And I just think at this time that, you know, if he

6  went to jail, a lot of things could mess up for him in his

7  life, you know, his business.  And I just don't see any value

8  in putting something--someone in jail that is already making

9  those changes, which is what, I believe, the system would want

10 him to do anyway, is to make those changes.

11        MR. MILAVITZ:  Thank you very much.

12        THE COURT:  Mr. Griess?

13        MR. GRIESS:  No questions.

14        THE COURT:  You may step down.

15                        (Witness excused.)

16        MR. MILAVITZ:  Your Honor, I have a statement to

17 make.  It's more of a legal argument than anything else, just

18 to add a few touches to what I've already filed with the Court.

19        THE COURT:  All right.

20        MR. MILAVITZ:  And I know that Mr. Gall wishes to

21 make a statement to the Court too, and I don't know which order

22 you want to have--

23        THE COURT:  I have the defendant allocute after I

24 hear from you about what the appropriate sentence is and after

25 I hear from the Government what they think the appropriate

1    sentence is.  Then I let the defendant make his allocution.

2         MR. MILAVITZ:  Thank you very much, Your Honor.

3         Your Honor, in preparing for this hearing today, I've

4    done a lot of thinking on how best to approach the Court

5    regarding Mr. Gall, and I think there's only one way to do

6    that, and I think what the Court--what we're asking the Court

7    to do is to look at the totality of circumstance of Mr. Gall's

8    life.

9         I believe--and although it may not fit under the pure

10   statutory interpretation as found in the U.S. Sentencing

11   Guidelines of 5K2.20 regarding aberrant behavior, I believe

12   that this incident or these series of incidents for three

13   months out of Mr. Gall's 26 years were aberrant behavior.

14        I have seen everything and talked to Mr. Gall, his

15   family, his friends, his girlfriend, and from what everybody

16   has told me and I think what's evidenced from the letters that

17   the Court has received--and those people know Mr. Gall far

18   better than I do and far better than, you know, you do, because

19   you've only seen him very little--I think that shows that

20   Mr. Gall is basically a very good person.  He's a responsible

21   person.  He's a positive member of our community.

22        He's somebody who is definitely not in need of

23   rehabilitation because he's done an admirable job of

24   rehabilitating himself.  This is a circumstance where you're

25   looking at a three-month window of his life.

1        THE COURT:  Counsel, I've got to tell you, I don't

2   know where it says three months.  My report says seven or

3   eight.  Does yours say three?

4        MR. MILAVITZ:  I believe that he was involved in this

5   from about June through August or--

6        THE COURT:  Mine says seven or eight.  Where does it

7   say three months?

8        MR. MILAVITZ:  If I could just have a moment.

9        Your Honor, I believe my three months came from the

10  actual discovery where he was mainly in the business--

11       THE COURT:  Well, I'm operating on the facts that I

12  deem not to be in dispute.  My report says March to September.

13       MR. MILAVITZ:  I believe in March--I believe that

14  under the discovery, the things that I've read, I think that it

15  was only through the summer of 2000 is when he really became

16  active in the business of dealing drugs.  I believe up until

17  that time, he was--he was--

18       THE COURT:  Here's what paragraph 5 says, counsel.

19  There's Attachment A, Stipulation of Facts, which states that,

20  "Beginning on or about February of 2000 and continuing to on or

21  about September of 2000, Brian Michael Gall voluntarily entered

22  into an agreement or understanding with others to distribute

23  MDMA."

24       That's a fact.  Are you telling me it's not true?

25       MR. MILAVITZ:  No, I'm not, Your Honor.

17

1          THE COURT:  Okay.  So I'm going to accept that he was

2    involved distributing this drug from February to September.

3          MR. MILAVITZ:  And I will accept what's written

4    there, Your Honor.

5          THE COURT:  Okay.

6          MR. MILAVITZ:  And I stand corrected, then.  I guess

7    what I was thinking of is when he was--when the volume picked

8    up, and that's when--

9          THE COURT:  Well, the only thing I know is what you

10   and Mr. Gall and the Government agreed to.  You agreed that he

11   was involved distributing from February to September, so I

12   wasn't prepared to come here and hear that it was three months

13   when it's not.

14         MR. MILAVITZ:  And I don't mean to take issue with

15   the Court.  We'll stand by that stipulation, Your Honor.

16         THE COURT:  Okay.

17         MR. MILAVITZ:  I think the--I think that even if you

18   look at it from that time period, it is a small window in

19   Mr. Gall's life, and it was at a point when he was in college.

20         And I think that when the Court--  What's happening

21   here is that Mr. Gall, by taking this plea bargain and taking

22   this plea, is saying, "I'm guilty of a felony.  I'm stepping up

23   to the plate here."  And I believe that that fact, in and of

24   itself, at such a young age of only being 26 years old, the

25   consequence of even having a felony conviction on one's record

1    at that time, and it's going to follow him throughout the

2    remainder of his life, is a very severe consequence, and it's a

3    weighty consequence that's going to follow Mr. Gall, and I

4    believe that that shows great responsibility and acknowledgment

5    of the punishment that's occurring just by that fact alone.

6            I honestly can come to the Court today and I can tell

7    the Court from what I've seen of Mr. Gall from his behavior

8    before this window of time and his behavior--and especially,

9    more telling, probably, his behavior since this window of time,

10   I believe that there is very little danger of a future harm,

11   either to the community or to anyone else.

12           Mr. Gall's behavior has been law-abiding.  He's left

13   that life behind.  He left that life behind over four years

14   ago, almost five years ago now, and he's basically done what we

15   all need to do, which is to follow the law, and he's done that.

16           I don't believe he's any future threat because of the

17   words that I have just stated, nor do I believe there's any

18   need of rehabilitation for Mr. Gall.  Mr. Gall has

19   self-rehabilitated himself, and from my experience, I think

20   that's the exception, not the rule.

21           My practice is mainly criminal defense, and I have

22   two--my two biggest problems with my clients are, number one,

23   acceptance of responsibility and reality, which I think is

24   always a large hurdle to overcome in a lot of instances, and

25   also the fact that, quite frankly, these people's lives are a

1   mess, and they need some help.  And they're gonna get it

2   through the system one way or another, but they need some help.

3          And I think in Mr. Gall's case, neither of those two

4   factors are present.  I think that he has rehabilitated himself

5   through the help, obviously, of his own character, as well as

6   through his friends and his family, and I think that he has

7   acknowledged the consequences of what he did.

8          Can you imagine, Your Honor, some--a federal agent

9   coming to your home three years down the road after you've left

10  college and you thought you've left that life behind and asking

11  you if you were involved in this activity during this time

12  period?  And Mr. Gall nodded his head in acknowledgment that he

13  was.

14         Regarding the issue of disparity in sentencings, I

15  know that the Court has sentenced every other person that's

16  been involved in this case to a prison sentence, and so the

17  Court may be thinking, "Well, why is Mr. Gall different?  Why

18  should I not give him the same type of sentence that I gave the

19  other people?  Why should Mr. Gall skate with probation?"

20         I think the answer is this:  I think Mr. Gall can be

21  differentiated from the other people that are involved in this

22  case quite simply by the factors that I enunciated to the

23  Court; his withdrawal from the conspiracy, his lifestyle that

24  he's lived since that time.

25         I think those two factors are key to the Court being

 1   able to say, "I can see why that this individual should be

 2   treated differently than the other individuals that have come

 3   forth in this court and been sentenced."

 4        Most of those individuals were still in the

 5   practice--in the business and still involved in illicit

 6   activities when they were caught by the Government.  Mr. Gall

 7   was not.  Mr. Gall had long ago left that life behind and was

 8   not doing what they were doing.

 9        It's not very often, Your Honor, that in my

10   experience, and I'm just giving you my experience, when I deal

11   with conspiracy cases that I've had somebody who's been charged

12   three years after the fact after withdrawing from a conspiracy.

13        There is no restitution in this case, obviously.  I

14   think there are a number of other factors that factor in to

15   Mr. Gall being--having an appropriate sentence of probation.

16   There are others who are depending on Mr. Gall.  There's his

17   family, who are depending on him, obviously, but, as I stated

18   in my memo to the Court and in my motion for downward

19   departure, he has two employees.  They're contract employees;

20   however, they do depend--they work pretty much exclusively for

21   Mr. Gall.  They don't work for anybody else.

22        Mr. Gall's business has grown to the point where the

23   manager of Pella windows for the state of Iowa recently

24   contacted him, I believe either yesterday or today, and wanted

25   to use him exclusively as an installer.  That's--  And if that

1   would occur and he would have contracts that would extend

2   indefinitely into the future, more employees would be taken on.

3        As it is right now, Mr. Gall has two people that work

4   for him on an exclusive contract basis, and he has contracts

5   that he's right in the middle of that he's waiting for windows

6   to arrive that he believes will take him another month to

7   finish those jobs.

8        He's got contracts that are out on bids to get him

9   enough work through--and his company enough work and his

10  employees enough work through the end of the summer, and that

11  could even go on, if the Court places him on probation, because

12  of this issue now with Pella windows.  That's the kind of

13  person they think of Mr. Gall.

14       And I know that the Court's seen the letters from his

15  employers or the people he contracts with as well as from his

16  employees.  So I think that there is a dependence--

17       THE COURT:  Counsel, let me interrupt.  I'm looking

18  at paragraph 89.  It tells me that in '03 he earned $27,000.

19  What did he earn last year?

20       MR. MILAVITZ:  Your Honor, I'm not sure.  If I can

21  have a moment.

22       THE COURT:  Please.

23       MR. MILAVITZ:  Your Honor, Mr. Gall believes, based

24  upon his recollection of his taxes, he earned approximately in

25  the mid-twenties, 24, 25 thousand.

22

1        THE COURT:  Okay.  And having been self-employed, I

2   know it fluctuates.  What's he earn now, if he's doing so well?

3   What are his earnings monthly or weekly?

4        MR. MILAVITZ:  If I can ask, Your Honor.

5        THE COURT:  Yeah.

6        MR. MILAVITZ:  He believes his gross income, Your

7   Honor, is somewhere in the neighborhood of 5 to 6 thousand, and

8   he believes his net income after paying his employees and for

9   expenses, 2 to 3 thousand dollars.

10        THE COURT:  A month?

11        MR. MILAVITZ:  A month.

12        THE COURT:  Okay.  Thanks very much.

13        MR. MILAVITZ:  Sure.

14        Just touching on some other factors that I believe

15   Mr. Gall would be an appropriate candidate for probation is his

16   lack of need for rehabilitation, as I've stated to the Court,

17   his compliance with authorities.

18        When the agents came to discuss this matter with him,

19   he complied.  When I was first brought into this case,

20   Mr. Gall, as you know, was living in Colorado, and that's how I

21   got involved, and when I spoke to the--Mr. Griess and to the,

22   you know, U.S. Marshals and arranging his surrender, he

23   voluntarily came back to Iowa.  There was not a problem with

24   him at all.

25        And he's had an excellent record of pretrial release.

1   Since he's been back, he's done everything that's been asked of

2   him.  There's been all clean drug tests, and there has been no

3   problems at all that I'm aware of.  And I don't know if the

4   Court is, but I'm sure that if there would have been something,

5   it would have been brought to the Court's attention, as well as

6   my attention.

7          So one can conclude from that that he has done

8   everything, and I know that the Court is aware that he's made

9   all of his court dates and there's never been an issue with

10  that.

11         THE COURT:  All right.

12         MR. MILAVITZ:  I know that the Court can downward

13  depart on its own motion, and I know that since Booker there's

14  an issue of if the Court even needs to downward depart to do

15  that, but I think that that's an issue that I wanted to just

16  touch on very briefly, that Mr. Gall did cooperate with the

17  Government, that when he was asked to come in and debrief, he

18  did so.

19         And we knew going into that whole situation that it

20  was totally up to the Government's discretion if they were

21  going to file a 5K1.1 motion or not.  And even knowing that--

22  And I also let Mr. Gall know that it's been my experience that

23  people who go in and speak to the Government and then go to

24  prison oftentimes are placed in a very difficult situation by

25  fellow prisoners.

1    Knowing all those issues, Mr. Gall still decided to

2    voluntarily go in and speak to the Government, and he flew in

3    specifically from Colorado, and we spent, I believe, an hour or

4    two with the agent, and I believe that Mr. Griess was present

5    during part of that--during that interview.

6    I believe that federal law--  And I want to cite the

7    case of U.S. v. King, 53 Fed. 3d 559.  There's some language in

8    there that states that the Court must evaluate an individual's

9    cooperation on an individual basis and cannot engage in a

10   mechanical reduction.

11   So I believe that there is sufficient case law out

12   there that does allow the Court, on its own motion or if it

13   believes it's the right thing, to determine, even if the

14   Government doesn't file a 5K1.1, to downward depart based upon

15   that.

16   THE COURT:  That's not the law in our circuit.

17   MR. MILAVITZ:  I understand, Your Honor, but I

18   believe other circuits have recognized that.

19   THE COURT:  In fact, I think most of the post

20   relevant conduct, the Government would claim is already given

21   credit to the defendant by acceptance of responsibility.  I

22   don't mean to make their argument for them, but at least that's

23   been my experience.

24   MR. MILAVITZ:  I understand.

25   THE COURT:  You're claiming that this is an

1    extraordinary acceptance of responsibility?

2            MR. MILAVITZ:  I think that under the King case, Your

3    Honor, that's where the Court said that the Court should not

4    just indulge in a mechanical three-point reduction for

5    acceptance of responsibility and go beyond.

6            THE COURT:  And what circuit is that from?

7            MR. MILAVITZ:  That is from the Third Circuit, Your

8    Honor, in 1995.

9            THE COURT:  Okay.

10           MR. MILAVITZ:  I think that one of the other things--

11   when I was preparing for this hearing, the thing that I had to

12   keep coming back to is that Mr. Gall falls under the guidelines

13   from 2000, not from today's date, and back in 2000, especially

14   pre-November of 2000--

15           THE COURT:  Actually, Ms. Dassinger--I believe her

16   report shows that she used the '99 guideline.

17           MR. MILAVITZ:  I guess that the point that I'm trying

18   to make is that up to November of 2000, the Sentencing

19   Commission allowed for a larger number of departures, a larger

20   area for departures, and some of the larger areas of departures

21   that I want to address very briefly with the Court are super-

22   acceptance of responsibility, which I believe applies in this

23   case; extreme remorse, which I think definitely applies in this

24   case; post-offense rehabilitation, which certainly applies in

25   this case; and a voluntarily--and probably one of the most

26

1   significant ones is a voluntary cessation of criminal conduct

2   before the discovery of the crime.

3        And this is a Tenth Circuit case, so I'm kind of

4   hometowning you from my circuit, Your Honor, but there is a

5   case called U.S. v. Nunemacher, N-u-n-e-m-a-c-h-e-r, and that

6   cite is 362 Fed. 3d 682, and that's actually a Tenth Circuit

7   case from 2004.  And there, the Court did find grounds for

8   downward departure for voluntary withdrawal or cessation of

9   criminal activity before, and I think that's significant in

10  Mr. Gall's case.

11       And I think, finally, one final area where the Court

12  can downward depart is the fact that Mr. Gall has engaged in

13  exceptional charitable and community activities and good works,

14  and for that proposition, I cite to the Court U.S. v. Cooper,

15  394 Fed. 3d 172, another Third Circuit case.

16       Obviously, the Court can tell I like the Third

17  Circuit, because I think that they're very generous with their

18  downward departures.

19       But I think that in this instance, Mr. Gall has done

20  a lot since he's been out, as noted in the letters to the

21  Court.  He has donated his time and his expertise to charitable

22  causes, specifically working on low-income and moderate-income

23  housing projects.

24       And given the fact that Mr. Gall is extremely busy

25  running his own business, where he's basically working at least

1    six days a week, I find it extraordinary that he can take his

2    only day off of the week and do this type of work.  I think

3    that's commendable for Mr. Gall.

4         So under the totality of the circumstances, Your

5    Honor, I believe there are significant areas for downward

6    departure from the guidelines.  And I understand that the

7    guidelines are only advisory at this point; however, I do

8    believe that most courts, and I'm sure this Court does too,

9    still relies and uses them as a benchmark, probably, to start

10   with.  I don't mean to be presumptuous.  I mean just that's

11   been my experience so far in federal courts since Booker.

12        But I do believe that even if the Court--I do believe

13   that the Court can look at the individual, can look at Mr. Gall

14   as the individual, and if it looks at Mr. Gall, the totality of

15   what Mr. Gall is, what he's done and where he's at now weigh

16   heavily in favor of not incarcerating Mr. Gall but, rather,

17   placing him on probation, allowing him to continue to be a

18   positive and vibrant member of our society.

19        And I know that Mr. Gall--  I guess we'll wait for

20   Mr. Griess.  Thanks very much.

21        THE COURT:  Right.  Thank you.

22        Mr. Griess?

23        MR. GRIESS:  Thank you, Your Honor.

24        I think it's always difficult after the Booker

25   decision to consider the interplay between the downward

1  departure motion and the Court's discretion that it now

2  possesses with regard to 3553(e), but I will go ahead and

3  discuss the downward departure issue just briefly, and I think

4  the best way to do this is just with regard to the general

5  subject matters defense counsel cites for reasons for a

6  departure.

7         First of all, with regard to age, of course, under

8  the policy statement that the defendant did cite, age is not

9  ordinarily relevant.  I would point out to the Court that the

10  defendant's age is very similar to other people in this case.

11  I don't think that there's anything about his age that is so

12  extraordinary that in and of itself would require a departure

13  from the Court.

14         With regard to his voluntary withdrawal from the

15  conspiracy in this case--  And the Government did stipulate to

16  this, because the evidence that it possessed is that that is

17  what occurred, but I do think the Court needs to understand

18  that the defendant is already receiving a significant benefit

19  from the fact that he did voluntarily withdraw.

20         Because he voluntarily withdrew before the guidelines

21  changed for MDMA or Ecstasy, he was sentenced at a much lower

22  conversion weight.  In 1999, the guidelines that are in effect

23  for today are 1 gram of MDMA equals 35 grams of marijuana.  The

24  conversion ratio that everyone else in this case will face is

25  that 1 gram of Ecstasy equals 500 grams of marijuana, or 14

1    times that conversion quantity that the defendant faces.

2         So the fact that he did voluntarily withdraw, he's

3    already receiving a significant benefit for that, and I'll talk

4    more about that in a little bit.

5         With regard to the three-month--or what the defendant

6    characterized as a three-month period of an involvement and

7    what I think the Court also realizes was a little bit longer

8    than that, essentially from late winter or early spring of 2000

9    into the end of summer, or just before Mr. Gall returned to

10   school at Iowa State, he was involved in the distribution of

11   Ecstasy, smaller quantities at first, and then it picked up to

12   much larger quantities as the summer went along.

13        The reason I believe this is already being taken into

14   account, Your Honor, is the fact that he's only being

15   accountable for those pills that he dealt with at that time.

16   As the Court knows, the law of conspiracy is that he could be

17   held accountable for what was foreseeable, but because he

18   withdrew from the conspiracy, in accordance with the law, he's

19   only held accountable for that.

20        So indirectly, he's already receiving a benefit from

21   the relatively small period of time he was involved in this

22   case from the other defendants who were involved.

23        With regard to cooperation with the Government, the

24   Court, I think, has already noted what the correct standard in

25   the Eighth Circuit is with regard to when the Court can depart,

1    but to the extent the Court would consider this as something

2    under 3553(a) that needs to be taken into consideration in

3    arriving at the defendant's sentence, I would just say that,

4    number one, as the Court noted, he has already received

5    acceptance of responsibility.

6         Number two, what the law requires of the defendant is

7    to provide substantial assistance, and while he did debrief and

8    cooperate, he did not substantially assist the Government in

9    the prosecution of others, through no fault of his own, but the

10   simple fact of the matter is that when he provided the

11   information, the individuals he knew about and could talk about

12   had already either confessed and were cooperating themselves or

13   were not individuals who the Government was pursuing at that

14   time.

15        I am not aware of any substantial risk to the

16   defendant's personal safety as a result of his cooperation

17   because, like I say, everyone he talked about has also already

18   cooperated.

19        The last thing and, I think, the most important thing

20   that I think needs to be taken into consideration by the Court,

21   and I'm going to talk about this in a minute--I'm going a

22   little out of order here--is the fact of the matter is it's not

23   that he came in and cooperated and gets no benefit.  He does

24   receive a benefit.  He gets safety valve.  Because he is

25   required under those provisions to truthfully debrief and

1    provide information, and because he did that, he receives an

2    additional two levels off of his sentence.

3         And so I think he is receiving credit for

4    his--already for his cooperation to the extent he did cooperate

5    and provide truthful information.  And just so it's clear for

6    the record, the Government did not use any of Mr. Gall's

7    information in the prosecution of another individual in this

8    case or any other.

9         With regard to aberrant behavior, quickly, and, once

10   again, this is no longer incumbent or required by the Court,

11   but the guidelines do indicate that in order to qualify for

12   aberrant behavior, the crime had to be committed without

13   significant planning and be of limited duration, specifically

14   only if the defendant committed a single criminal episode,

15   occurrence, or single criminal transaction.

16        That obviously is not the case here.  There was

17   significant planning, up to and including a meeting whereby a

18   group of individuals discussed how they were going to proceed

19   at a certain point in the conspiracy just prior to the two

20   5,000 shipments--5,000-pill shipments of Ecstasy that occurred.

21        It was not a one-time occurrence, it was multiple

22   transactions, and for those reasons, under the law or under the

23   guidelines section 5K2.20, the defendant does not qualify for

24   aberrant behavior or a reduction for aberrant behavior.

25        Turning to the factors in the 3553, Your Honor, I

1    think it's important for the Court to contemplate on the

2    seriousness of the offense, obviously, to promote respect for

3    the law and provide just punishment for the offense.

4         Essentially, what occurred in this case is in

5    February of 2000, Defendant hooked up with Luke Rinderknecht,

6    who at that time was living in Central College--or in Pella,

7    Iowa, going to Central College in Pella, Iowa.  There were

8    small, I believe one- to two-hundred-pill, purchases being made

9    at that time by Mr. Gall from Mr. Rinderknecht.

10        After a period of time--or after he graduated,

11   actually, Mr. Rinderknecht was going to move to California.  He

12   met with other individuals in the conspiracy, Mr. Gall and

13   Mr. Sauerberg, and then a plan was developed about how they

14   were going to continue to sell drugs when Rinderknecht left.

15   Specifically, Rinderknecht would mail them to Sauerberg,

16   Sauerberg would provide the pills to Gall, who would then

17   distribute to other individuals.  Gall would provide the money

18   back to Sauerberg, and the money would then go back from

19   Sauerberg to Rinderknecht.  That's how this conspiracy worked

20   with regard to this group of people.

21        The people Mr. Gall stipulated to selling Ecstasy to,

22   I think this is significant, because the Court needs to be

23   cognizant of the fact of what the other individuals received

24   for sentencing.  Mr. Harbison, who was the customer of

25   Mr. Gall's, received a 30-month sentence; Mr. Gooding, who was

1   a customer of Mr. Gall's, received a 35-month sentence; and

2   Mr. Coleman is actually still pending sentence.

3          However, in approximately September of 2000, Gall did

4   decide to cease his activities and the involvement in this case

5   and, in fact, communicated that fact both to Mr. Rinderknecht

6   and to at least one of his customers, I believe it was

7   Mr. Coleman.

8          There were two large-quantity shipments of pills that

9   Mr. Gall's being held accountable for in this case, Your Honor.

10  Those were the two 5,000-pill shipments.  I take issue a little

11  with the fact--with the idea that these are small to medium

12  quantities.  The fact is that's 10,000 pills, which, no matter

13  how you look at it, is not a small quantity.

14         I think this is especially true when you consider

15  that Mr. Gall profited 30 to 40 thousand dollars as a result of

16  his involvement in this case.  I think that also needs to be

17  considered by the Court when considering whether this is just a

18  one-time product of some misguided youth or a real serious

19  criminal offense, which it clearly is.

20         THE COURT:  Mr. Griess, come back to where you are,

21  and I apologize for interrupting, but I was writing as you were

22  telling me, and looking at my report as well.  You told me two

23  other defendants, and I have my report here, and on page 1, you

24  told me Harbison, and I couldn't write quick enough.  You said

25  30 months, and then you named another defendant, whom I didn't

1    hear, and you said 35 months.

2         MR. GRIESS:  That's correct.  His name is

3    Mr. Gooding.

4         THE COURT:  Gooding, okay.  Now, these are not listed

5    on the report as other co-defendants.  That's the reason I

6    didn't have it.  They're not listed as co-defendants or related

7    cases, but they are?

8         MR. GRIESS:  They are, Your Honor.  And you can see,

9    if you would look at the plea agreement in the case, that these

10   are the individuals who the defendant was supplying with MDMA.

11        What happened in this case, Your Honor, and the

12   reason probably why those aren't included, is the investigation

13   occurred over time whereby one individual was arrested, he

14   pointed to another individual, who pointed to another

15   individual, and they went right up the chain to the top.

16        Now, when those last people in the conspiracy were

17   charged, including the suppliers for Ecstasy and cocaine, the

18   remainder of the people who hadn't been approached early on

19   were also charged.

20        So Mr. Gooding and Mr. Harbison, along with some

21   other individuals, a person by the name of Dryer, I believe one

22   other possibly, were convicted along the way.  And I did

23   confirm this morning through electronic filing system that

24   those were the sentences that they did receive.

25        THE COURT:  That must have been somebody other than

1    me.  I don't remember those defendants.

2           MR. GRIESS:  That's very--could be the case, Your

3    Honor.

4           THE COURT:  All right.

5           MR. GRIESS:  In fact, I believe it was Judge

6    Longstaff.

7           THE COURT:  Okay.

8           MR. GRIESS:  The last point I was making, Your

9    Honor--

10          THE COURT:  Before I get off that, how long did they

11   stay, if you remember--  You probably know more about this case

12   than anybody.  How long did those two stay in the conspiracy,

13   and did they voluntarily withdraw?

14          MR. GRIESS:  They did not.

15          THE COURT:  They did not?

16          MR. GRIESS:  They did not voluntarily withdraw.  And

17   they were in the conspiracy, I think, for a shorter period of

18   time, but at the very end.

19          THE COURT:  Okay.  Thank you.

20          MR. GRIESS:  A significant difference there, Your

21   Honor, is that they were in the conspiracy after the guidelines

22   changed and, therefore, were sentenced at a much higher level

23   because of that.

24          THE COURT:  Okay.  I interrupted you.  I apologize.

25          MR. GRIESS:  That's all right.  Thank you, Your

1  Honor.

2          The last point I was making, I'm sure the Court heard

3  me, was with regard to the profit.  I think the fact that he

4  made 30 to 40 thousand dollars of ill-gotten gain in this case

5  is a significant factor when the Court looks at seriousness of

6  this particular offense.

7          THE COURT:  Where is that in the evidence?  I mean,

8  I'm not disputing you.  I saw a figure referred to of $85,000

9  that Rinderknecht got delivered to him.  I didn't see any other

10  figure.  Was there another figure in the report?

11          MR. GRIESS:  Indeed, Your Honor.  If I could just

12  have one moment.

13          THE COURT:  Okay.

14          MR. GRIESS:  It's paragraph 32.

15          THE COURT:  Okay.

16          MR. GRIESS:  Which indicates that Harbison estimated

17  that Gall made approximately 40,000 from selling Ecstasy.  I

18  say 30 to 40 because Mr. Gall, in paragraph 30, indicated

19  $30,000--

20          THE COURT:  Okay.

21          MR. GRIESS:  --was the appropriate amount.

22          THE COURT:  So Harbison estimated Gall made

23  approximately $40,000 is what 32 says.

24          MR. GRIESS:  Correct.  And, like I said, Mr. Gall

25  said 30,000, and that's why I mentioned to the Court 30 to 40

1    thousand.

2           THE COURT:  Right.

3           MR. GRIESS:  The $85,000 figure would have

4    represented cost, not profit, and, obviously, what

5    Mr. Rinderknecht would have then taken his profit out of and

6    passed along the price to his supplier, which was Mr. Morataya.

7           I think there is a question of deterrence in this

8    case.  I think that other individuals need to know that you

9    cannot sell significant quantities and make significant profits

10   from MDMA or Ecstasy, even for a short period of time, and

11   escape accountability for those crimes.

12          The last thing I think I want to talk about goes to

13   sentencing disparity, Your Honor.  Obviously, the Court is

14   cognizant of that and wants to avoid any unwarranted sentencing

15   disparities.

16          Last Friday, before Judge Gritzner, another

17   co-defendant in this case was sentenced.  His name is Jarod

18   Yoder, and I believe that those present very similar

19   circumstances to the Court in terms of the relative

20   involvement.

21          Mr. Yoder, pursuant to the plea agreement and as

22   corroborated by the presentence report--these are all matters,

23   Your Honor, that were discussed in open court--was responsible

24   for 5,000 pills or 1,250 grams of a mixture and substance

25   containing MDMA, which, because he was involved after the

1    guideline range equivalents--or is the equivalent of a Level 28

2    quantity of drugs.  Yoder was ultimately sentenced to a

3    36-month term of imprisonment.

4         Mr. Gall was represented as responsible in this case

5    for a larger quantity, in fact, double the quantity of pills,

6    10,000 pills, but because his involvement stopped--and I think

7    he does get credit, he is getting credit for the fact that he

8    voluntarily withdrew, and the biggest credit is the fact that

9    he doesn't have to deal with the higher guideline figure--he's

10   responsible only at a Level 24, four levels lower, even though

11   he's about double the amount of pills.

12        Both Yoder and Gall were receiving Ecstasy from

13   Rinderknecht--Yoder was in Minnesota at the time; Mr. Gall was

14   in Iowa, of course--and they were redistributing it for profit.

15   In terms of differences between their cases, as I said, Yoder

16   was a smaller quantity of pills but a longer period of time.

17   It wasn't quite as short a period of time.  I think his last

18   involvement was March of 2002.  I think the start times were

19   similar, but, again, it was more sporadic and drawn out, and

20   he, obviously, paid the consequences for that.

21        Again, other differences are the fact that Gall did

22   withdraw.  There is a criminal history difference.  Mr. Yoder

23   did not receive the safety valve.  He had two convictions for

24   possession of marijuana, and that is all.  Unlike Mr. Gall,

25   though, he did not receive a deferred judgment on one of those,

1    and so those counted.  He was Criminal History Category II and

2    did not receive the benefit of the safety valve.

3            THE COURT:  How did he get to 36?  Did he

4    substantially assist?

5            MR. GRIESS:  No.  No, Your Honor.

6            THE COURT:  Okay.  How did he get to 36?  If there

7    was a mandatory minimum, I'm assuming, because you're talking

8    about safety valve, then he must have done something.  How did

9    he get below the mandatory minimum?

10           MR. GRIESS:  There is no mandatory minimum, just like

11   there isn't in this case.

12           THE COURT:  Oh, okay.

13           MR. GRIESS:  In that case, the safety valve doesn't

14   operate to get you below a mandatory minimum, but you do

15   receive the benefit, like Mr. Gall's getting here today, of a

16   two-level reduction.

17           THE COURT:  Okay.

18           MR. GRIESS:  So essentially, he was at a Level 28,

19   received two--three levels off for acceptance of

20   responsibility, and then a Criminal History Category II.  That

21   was the sentence he received, 36 months' imprisonment.

22           That is not 36 months--  The Court then, Judge

23   Gritzner, evaluated, as this Court will do under the statute,

24   and determined that 36-month sentence was appropriate under the

25   circumstances.

1          THE COURT:  Okay.  All right.

2          MR. GRIESS:  But just in terms of pure comparison,

3   that I think their relative contact, their age--in fact,

4   Mr. Yoder was a little bit younger than Mr. Gall--at the time

5   of his sentencing Yoder was gainfully employed--he was an

6   underwriter at a credit organization, his employer is holding

7   his job open--no pretrial release violations, no involvement

8   whatsoever in criminal conduct or specifically this conspiracy

9   since March of 2002.  So I think those situations are very,

10  very similar, and he received a 36-month sentence.

11          For all of those factors, Your Honor, I think that a

12  sentence at the low end of the guideline range in this case or

13  to 30 months is appropriate to address all the factors pursuant

14  to Title 18, United States Code, Section 3553(e)--or 3553, as

15  well as the other factors the Court will take into

16  consideration in sentencing the defendant.

17          Unless the Court has any questions, that's it.

18          THE COURT:  I do.  Mr. Griess, as a legal matter, I

19  saw an opinion the other day, and I didn't probably read the

20  opinion as well as I should have, but the Judge--I think it was

21  one of the districts in Florida, the Judge said he was--this is

22  probably unfair characterization--he was critical of the

23  Government for always standing on the guideline, guideline,

24  guideline on the theory that that's not the law anymore.

25          It is the law that we have to consult and seriously

1  consider the guidelines, but the recommended sentence doesn't

2  always have to be the guideline.  Are you suggesting here that

3  the appropriate sentence is the guideline here?

4          MR. GRIESS:  Yes.

5          THE COURT:  Okay.

6          MR. GRIESS:  I absolutely acknowledge, as I have

7  before this Court in the past, that the Court is not bound by

8  the guidelines.

9          THE COURT:  No, no, no.  I know that.  But have you

10  ever recommended anything other than--  And it may be the

11  policy, and I guess that's what I need to know.  Have you ever

12  recommended anything to a sentencing Judge in the Southern

13  District of Iowa except a guideline sentence?

14          MR. GRIESS:  I haven't, Your Honor.

15          THE COURT:  All right.

16          MR. GRIESS:  But I want to be clear to the Court, if

17  I could, that that's not--that's not out of some blind

18  following of a policy.  It's because I personally believe that

19  the guidelines are appropriate and should be followed.

20          THE COURT:  Well, you always know the factual record

21  very well, Mr. Griess, so I'm sure that that's an honestly

22  arrived at answer.

23          MR. GRIESS:  Thank you.

24          THE COURT:  Mr. Gall, before you make your statement

25  of allocution, I wanted to tell you that I received and have

1    read letters from Tina Plett Kalanoff (phonetic)--I'm probably

2    mispronouncing it--and from Christopher Shawn King and from

3    Eric Kellina, and as well I also got letters, and I read them,

4    before today from your aunt, Cheryl Meyer; Mr. Waddell, who

5    signs it as the Pella sales manager.

6            And then I got a letter from Michael McKenna and

7    Jennifer McKenna, and I got a letter from Fred Novy--Kelli,

8    that's N-o-v-y--and a letter from Kerri Hanna, who I believe

9    from the report is your sister.  And then I got a letter from

10   Mark Anderson, who describes himself as the retail replacement

11   sales manager for Pella windows and doors.

12           I got a letter from Michael Glick in Solon, Iowa; and

13   a letter--a letter signed by Glen and Bernie Leach from

14   Davenport; and a letter from Deb Lamp and another letter from

15   Debra Stillwell and a nice letter from your mother and a letter

16   from Michael Meyer and another letter from your father--a

17   letter from your father; a letter from Amy Plett, P-l-e-t-t,

18   who I believe is your girlfriend, if I read the report right;

19   and then I also got a letter from Laura Meyer.

20           So, Mr. Gall, you have a right of allocution, which

21   every defendant does before sentence is pronounced.  It's

22   supposed to be as much for the sentencing Judge as it is you,

23   so if you have anything to say or you want to say, you may do

24   so.

25           THE DEFENDANT:  Do you want me to stand up?

43

1          THE COURT:  Yes.  I can probably hear you better.  As

2     long as the reporter and I can hear you, and if I can't hear

3     you, I'll tell you.

4          THE DEFENDANT:  All right.

5          MR. MILAVITZ:  Your Honor, before Mr. Gall exercises

6     his right to allocution, I'd like to--  Am I allowed to comment

7     on anything that Mr. Griess said?

8          THE COURT:  Okay.

9          MR. MILAVITZ:  Thank you very much.

10         I just have a very brief comment.  I believe that

11    according to the discovery that I read, and I may be wrong

12    about this, and I just asked Mr. Gall, but he did confirm it,

13    and I don't know if Mr. Griess is aware of this or not, but the

14    two people that Mr. Griess compared Mr. Gall to, Mr. Gooding

15    and Mr. Harbison, who he said were in the conspiracy for, I

16    believe, shorter amounts of time, it's my understanding from

17    talking to Mr. Gall that they were involved in the conspiracy

18    while Mr. Gall was and then continued to remain in the

19    conspiracy after Mr. Gall withdrew.

20         So that--  And that is my recollection too.  I

21    believe they were much smaller quantities as far as sellers.  I

22    believe that Mr. Gall was selling to them and then they were

23    reselling, but I believe that is my recollection.  And I may be

24    incorrect, but that's what I believe is the case.

25         THE COURT:  Mr. Gall?

1          THE DEFENDANT:  I first want to let you know that I

2    was young and stupid when I committed this crime, and at that

3    time my knowledge of the crime--I was lacking knowledge of how

4    serious the crime was, and I'm willing to take full

5    responsibility of the choices that I made.

6          I also wanted to let you know that I disengaged from

7    these activities voluntarily.  I continued on with my life.  I

8    went on to get a degree from the University of Iowa, moved away

9    from the bad people I was hanging out with, and, of course, as

10   you know, I've started my own business.

11         As my punishment goes, I am--I am ready to receive

12   whatever kind of punishment you will give me today, but I want

13   you to keep in mind that there's a lot of people depending on

14   me, including my family, friends, business associates, my

15   employees, my community.  My unfinished work, my--the jobs I

16   already have that stretch into August, if I receive a prison

17   sentence today, I will be damaging the relationships that I

18   have with these people.

19         So I'm asking you for a probation sentence and a

20   chance to prove to you and all these people that I have changed

21   my life and that I am going to continue to strive down the new

22   road that I have created.

23         THE COURT:  Thanks very much.

24         The record should show--  You can be seated, because

25   I'm going to be talking for a while.

1          Mr. Gall, the lawyers and I necessarily, for the

2    purposes of doing what the Congress and the Courts tell us to

3    do, we have to speak in this language that permits my judgment

4    to be reviewed, as both you and the Government are entitled to

5    have it reviewed under the law, so I speak in terms of

6    guidelines and cases, that sort of thing.  It does not detract

7    from the fact that the Judge who sentences a person should know

8    the consequences of sentencing another person.

9          So oftentimes, in retrospect, it appears that the

10   sentencing Judge is referring to this or that guideline, this

11   or that range, or that sort of thing.  It's important that you

12   know that we don't speak this way on purpose, we have to comply

13   with what the law demands of us.

14         It's the Judge's duty in this case to calculate the

15   guidelines, and I consider it necessary to address the requests

16   that your lawyer has made to depart from the guideline that

17   Ms. Dassinger, you, and the Government have agreed is the

18   appropriate guideline, given what happened in this case, and so

19   for the purposes of doing that, I adopt what Ms. Dassinger

20   tells me happened in this case in terms of the conduct.  I have

21   incorporated into that the stipulation, that is, the agreement

22   between the parties as to what happened in this case.

23         And, therefore, the total offense level is 19, the

24   criminal history category is I.  The Court, under the advisory

25   guidelines, has to consult and seriously consider the total

1  offense level, as well as the criminal history category.  The

2  imprisonment range that that yields is 30 to 37 months, a

3  supervised release range of two to three years, and a fine

4  range of 6,000 to a million dollars.

5       With respect to the aberrant behavior request, the

6  Court is unable to grant such a request under the advisory

7  guidelines.  The aberrant behavior contemplated, in my view, by

8  the guidelines is, as the Government pointed out, an act that

9  is of limited duration.  It seems to me the activity described

10  in the report, as well as the stipulation, make the aberrant

11  behavior not grounds for departure.

12       Likewise, what counsel described as a super-

13  acceptance of responsibility is denied.  The defendant's

14  already given credit by the guideline for acceptance, and it's

15  reflected in the report.

16       Likewise, the Court denies a request for a departure

17  based upon remorse or post-offense rehabilitation or for

18  voluntary cessation of criminal activity before it was

19  discovered by the Government.  I think the better way to

20  address these matters is within the confines of the statute,

21  which I'm going to do.

22       Mr. Gall, the statute is 3553(a), and so while I've

23  considered the guidelines, the Court is going to give a

24  sentence other than that contemplated by the guidelines in this

25  case, and I'm going to be reading this into the record for

1   purposes of the parties, as well as the Court of Appeals.

2       As required by 18 United States Code 3553(a), in

3   imposing the following sentence, the Court has considered the

4   nature and circumstances of the present offense, along with the

5   characteristics of this defendant.  In addition, the Court has

6   reflected upon the seriousness of the offense, the need for

7   adequate deterrence, the protection of the public from further

8   crimes by this defendant, the need for the defendant's

9   rehabilitation, the types of sentences available, the suggested

10  sentencing range outlined in the United States Sentencing

11  Guidelines, along with pertinent policy statements.

12      The Court also continues to heed the admonition of 18

13  United States Code 3582(a) that expressly recognizes that,

14  quote, imprisonment is not an appropriate means of promoting

15  correction and rehabilitation, end of quote.

16      On March 2nd, 2005, the defendant pleaded guilty to

17  one count of conspiracy to distribute MDMA under 21 U.S.C. 846,

18  841(b)(1)(C), a Class C felony.  See the plea agreement at page

19  1.

20      The Court in particular has taken into account the

21  defendant's voluntary and explicit withdrawal from the

22  conspiracy in September of 2000; the defendant's exemplary

23  behavior while on bond; the support manifested by family and

24  friends who have attested to the defendant's character; the

25  lack of criminal history, especially a complete lack of any

1   violent criminal history; the immaturity of the defendant.

2          This factor is not an inconsequential consideration.

3   Recent studies on the development of the human brain conclude

4   that human brain development may not become complete until the

5   age of 25.  See Elizabeth Williamson, "Brain Immaturity Could

6   Explain Teen Crash Rate," Washington Post, page A01, February

7   1st, 2005, summarizing a recent National Institutes of Health

8   study that suggests, quote, that the critical region of the

9   brain that inhibits risky behavior is not fully formed until

10  age 25, end of quote.

11         This is of critical importance in the area of

12  criminal law.  The Sentencing Commission, in its studies, has

13  deduced that recidivism rates drop as the age of a defendant

14  increases.  See United States versus Nellum, 2005 Westlaw,

15  300073, February 3rd, 2005, Northern District of Indiana.

16         The Supreme Court of the United States based its most

17  recent death penalty decision, Roper versus Simmons, on studies

18  indicating adolescents are less culpable than adults for their

19  actions.  See 125 Supreme Court 1183 at 1195, 2005, stating

20  that, quote, as any parent knows, and as the scientific and

21  sociological studies respondent and his amici cite tend to

22  confirm, quote, a lack of maturity and an underdeveloped sense

23  of responsibility are found in youth more often than in adults

24  and are more understandable among the young.  These qualities

25  often result in impetuous and ill-considered actions and

1   decisions, end of quote.

2           It has also been noted that, quote, adolescents are

3   overrepresented statistically in virtually every category of

4   reckless behavior, citing Arnett, "Reckless Behavior in

5   Adolescence: A Developmental Perspective," 12 Developmental

6   Review 339, 1992.

7           While the Roper versus Simmons Court held the

8   imposition of the death penalty is unconstitutional for those

9   people who committed the death-eligible crime before the age of

10  18, the recent National Institutes of Health report confirms

11  that there is no bold line demarcating at what age full

12  maturity is reached.

13          While age does not excuse behavior, a sentencing

14  court should account for age in discovering the overall

15  characteristics of the defendant, particularly at the time he

16  engaged in the conspiracy in this instance from March of 2000

17  through September of 2000.

18          Since the time of the offense conduct, the defendant

19  has graduated from the University of Iowa with a degree in

20  computer science.  The defendant owns and operates BMG

21  Construction Service, a company principally devoted to

22  subcontracting for the installation of Pella windows and doors.

23          Representatives of the Pella Corporation have also

24  written to the Court describing the defendant as, quote,

25  reliable, honest, friendly, and polite, end of quote, with a,

1   quote, superior work ethic and a valuable resource, end of
2   quote.

3        Soon the defendant's company will begin a significant
4   construction project, the replacement of windows and doors at
5   Northwestern University in Evanston, Illinois.

6        The Court can only conclude from the defendant's
7   post-offense conduct that he has, in fact, learned from his
8   experience with the United States criminal justice system and
9   has admirably moved to secure a better future for himself.

10        The Court, however, is bound to impose a sentence
11   that reflects the seriousness of joining a conspiracy to
12   distribute MDMA or Ecstasy.  This can best be accomplished in
13   this case by a term of probation for three years with
14   appropriate conditions.  Under 18 United States Code 3561(a),
15   it allows the Court to grant probation for offenses other than
16   a Class A or Class B felony.

17        The Court reminds the defendant that, quote,
18   probation, however, is not an act of leniency.  Probation is a
19   substantial restriction of freedom.  It is not forgiveness, and
20   it is not endorsement of the offense.  See State versus
21   Peckenschneider, 236 Northwestern Second 344 at 353.

22        The Sentencing Guidelines in the introductory comment
23   to Part B, quote, Probation, state that, quote, probation may
24   be used as an alternative to incarceration provided that the
25   terms and conditions of probation can be fashioned so as to

1    meet fully the statutory purposes of sentencing, including

2    promoting respect for the law, providing just punishment for

3    the offense, achieving general deterrence, and protecting the

4    public from further crimes by the defendant, end of quote.

5         The Court recognizes that according to the Sentencing

6    Guidelines, probation is not recommended when, as in this case,

7    the guideline range falls outside of Zone A.  This is because

8    the offense level in this case, based solely upon the drug

9    quantity, as the lawyers have pointed out, subjects the

10   defendant to a final offense level of 19.

11        Other courts have recognized, however, that for a

12   variety of reasons, the guideline calculations based on drug

13   amount may overrepresent the offense conduct.  See United

14   States versus Smith, 359 Fed. Supp. 2d 771 at 776, Eastern

15   District of Wisconsin, 2005, noting that the defendant's

16   offense conduct would have been reduced by six levels if he was

17   responsible for powder instead of crack cocaine.

18        See also United States versus Nellum, cited earlier

19   in my colloquy, describing the system of drug quantities as

20   random as it plays out in reality.

21        See also United States versus Huerta-Rodriguez, 35

22   Fed. Supp. 2d 1019 at 1026, Footnote 6.  Judge Batillon states,

23   quote, the quantity system was developed to punish--was

24   developed to punish bigger distributors more harshly, but the

25   practice of charging conspiracies over a long period of time

1   has the result of aggregating many small distributions so as to

2   make a long-term small-quantity distributor look like a

3   large-quantity distributor.

4          While not denigrating the seriousness of the offense

5   conduct in this case, the Court finds the offense level based

6   solely upon drug quantity does not adequately reflect the

7   offense conduct.

8          Nevertheless, under the statutory mandates of

9   3553(a), the Court finds that the circumstances of the offense

10  and the character of the defendant as described by the Court in

11  this colloquy warrants a sentence of probation.

12         18 United States Code 3563(b) authorizes the Court to

13  provide, along with the mandatory provisions of probation,

14  discretionary conditions in keeping with factors set forth in

15  3553(a)(1) and (a)(2).

16         Accordingly, the Court also provides these conditions

17  of probation:  You shall participate in a program of testing

18  and treatment for substance abuse as directed by the probation

19  office until such time as you are released from the program by

20  the probation office;

21         Two, you shall not use alcohol and/or other

22  intoxicants during and after the course of treatment;

23         Three, you shall submit to a mental health evaluation

24  and participate in treatment if recommended, which may include

25  compliance with any medical regime recommended by treatment

1  personnel as directed by the probation office;

2      Four, you shall not patronize business establishments

3  where more than 50 percent of the revenue is derived from the

4  sale of alcoholic beverages;

5      Five, you shall work only in employment approved by

6  the U.S. Probation Office.  You shall consult the U.S.

7  Probation Officer prior to any changes in employment.  You

8  shall not terminate any employment without prior approval of

9  the probation office.

10      Mr. Gall, your conduct from about age 16 through the

11  time you withdrew from this conspiracy indicates a lot of

12  addictive behavior.  Your blood alcohol was .39 in the

13  accident.  I assume you were lucky to have escaped injury.  You

14  better get some medical treatment that recognizes you

15  apparently have a disease.

16      Most of us have no insight into our mental health or

17  addictive behavior, so the only thing that I wish you would

18  have done between your withdrawal from the conspiracy and now

19  is to get some help.  I think you have an addiction problem.

20  Looking at this record, I think any objective observer would

21  have to agree with that.

22      In addition, if you've not yet done so already,

23  Mr. Gall, you should pay $100 to the clerk's office on behalf

24  of the crime victims fund.  Based upon what Ms. Dassinger and

25  your lawyer tell me is your financial condition, there's not

1    going to be any further fine or penalty due based upon what I

2    deem right now is your inability to pay.

3              Counsel, do you have anything further before I advise

4    the defendant of his constitutional right of appeal?

5              MR. GRIESS:  No, Your Honor.

6              MR. MILAVITZ:  Your Honor, the only issue that I have

7    is I assume the standard terms and conditions of probation also

8    apply along with--

9              THE COURT:  You should review those with your client,

10   counsel.  That will be in the judgment and commitment order.

11             MR. MILAVITZ:  Okay.  I'm not--  And excuse my

12   ignorance, but I'm not familiar with the standard terms and

13   conditions in this District, but, however, in the District of

14   Colorado, typically one cannot leave the state without

15   permission by the probation officer or the Court, and what I'm

16   going to ask the Court--

17             THE COURT:  That's number one in our standard

18   conditions.  I'll have my law clerk give them to you so you can

19   review them with the defendant.

20             MR. MILAVITZ:  I will ask the Court--  As noted in

21   the presentence report and also in the questions to Mr. Gall's

22   parents or--I believe somewhere, maybe to me, Mr. Gall is

23   part-owner of a vacation home in Lake of the Ozarks in

24   Missouri.

25             I will ask the Court--  He's got a vacation planned

1    for this weekend, basically, and I would ask the Court to allow

2    him to travel to that vacation home for this weekend, if that's

3    possible.  He's already talked to his probation officer or his

4    pretrial release officer, and I believe their response to him

5    was that's fine, but he needs the Court's permission.

6              THE COURT:  Okay.  You should talk to the people in

7    supervision yet today, Mr. Gall.  It's not a problem for me,

8    but you should talk to people in supervision.  Ms. Wilson is

9    our supervisor.  Ms. Dassinger can put you in touch with her

10   immediately.

11             THE DEFENDANT:  Okay.

12             THE COURT:  Anything else?

13             MR. MILAVITZ:  Thank you very much, Your Honor.

14             THE COURT:  Mr. Gall, this is a final judgment of the

15   District Court.  You and the Government have an opportunity to

16   appeal my judgment to the Court of Appeals if you believe the

17   sentence is illegal or unreasonable.  If you or the Government

18   want to take that appeal, you have to file a written notice

19   with the clerk of court within ten days of the entry of today's

20   judgment.  You have to serve a copy on the United States

21   Attorney's Office.

22             The law further requires that I tell you that if you

23   do want to take an appeal from the judgment and commitment

24   order, you have to show me you are unable to afford a lawyer,

25   and I have to appoint a lawyer to represent you on the appeal.

1          Mr. Gall, do you have any questions about your

2     judgment and commitment order here today or about your

3     constitutional right of appeal?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  We'll be in recess.

6          (Proceedings concluded at 2:55 p.m.)

57

1                    C E R T I F I C A T E

2          I, the undersigned, a Certified Shorthand Reporter of

3   the State of Iowa, do hereby certify that I acted as the

4   official court reporter at the hearing in the above-entitled

5   matter at the time and place indicated.

6          That I took in shorthand all of the proceedings had at

7   the said time and place and that said shorthand notes were

8   reduced to typewriting under my direction and supervision, and

9   that the foregoing typewritten pages are a full and complete

10  transcript of the shorthand notes so taken.

11         Dated at Des Moines, Iowa, this 3rd day of June, 2005.

12

13

14

15         _____

16                CERTIFIED SHORTHAND REPORTER

17

18

19

20

21

22

23

24

25